UNITED STATES of America, Appellee,

v.

**Peter EVANGELISTA and Anthony Evangelista, Defendants,**

**Louis Evangelista and Claude Evangelista, Defendants–Appellants.**

**Nos. 1478, 1479, Dockets 96–1712(L), 96–1718(CON).**

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1997.

Decided Aug. 13, 1997.

Stuart E. Abrams, Frankel & Abrams, New York City (David S. Hammer, Kostelantz & Fink, LLP, New York City, on the brief), for Defendant–Appellant Louis Evangelista, Sr.

David I. Schoen, New York City, for Defendant–Appellant Claude Evangelista.

Demetri M. Jones, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, Peter A. Norling, Assistant United States Attorney, on the brief), for Appellee.

Before: OAKES, KEARSE, and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

Following a 13–day jury trial, Louis Evangelista, Sr. and his son, Claude Evangelista, were convicted in the United States District Court for the Eastern District of New York (Wexler, *J.*) of conspiracy to defraud the United States by impeding the Internal Revenue Service in the collection of income and payroll taxes (in violation of 18 U.S.C. § 371), and failure to pay withholding taxes and FICA contributions to the IRS (in violation of 26 U.S.C. § 7202). Evangelista, Sr., who also was convicted of evading personal income taxes (in violation of 26 U.S.C. § 7201), was sentenced to 51 months in prison and three years of supervised release, and a $1,150 special assessment. Claude Evangelista was sentenced to 46 months in prison and three years of supervised release, and a $450 special assessment. The district court's judgment of conviction and sentence for each defendant was entered on October 30, 1996; both defendants filed timely appeals.[1]

The Evangelistas' separate briefs make essentially identical arguments, Claude Evan-

---

1. Co-defendant Peter Evangelista pled guilty to evasion of taxes and conspiracy to impede the collection of taxes, and co-defendant Anthony Evangelista was acquitted after trial.

gelista expressly joining in and adopting all of his father's legal arguments pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure.[2] First, they claim that the district court erred by refusing to instruct the jury as to their specific theories of defense, chiefly that their failure to pay taxes resulted from severe financial pressures, and that they did not subjectively believe the nonpayment to be unlawful because they were relying on their accountant's advice that payment could be deferred pending negotiation of a formal payment agreement with the IRS. Second, they argue that their convictions under 26 U.S.C. § 7202 were invalid because that statute requires proof of *both* (a) willful failure to "pay over" payroll taxes, *and* (b) willful failure to "truthfully account for" such taxes, the latter of which the government did not prove beyond a reasonable doubt. Third, the Evangelistas contend that § 7202 is governed by a three-year statute of limitations rather than the six-year period used by the district court, so that many counts of their convictions should have been dismissed. Finally, they argue that the prosecutor's intemperate response to an audible comment by Evangelista, Sr. from the defense table—the prosecutor sarcastically "call[ed] Louis Evangelista to the stand"—prejudiced the jury, was inadequately cured by the court's instruction, and irreparably tainted their convictions.

We affirm the Evangelistas' convictions and sentences in full. We write primarily to address their second argument, regarding the proper construction of, and the requirements for conviction under, 26 U.S.C. § 7202.

## BACKGROUND

Louis Evangelista, Sr. and members of his family—including his son Claude, and his brothers (co-defendants) Peter and Anthony—owned and operated several businesses active in real estate development and management, construction, and equipment rental. These businesses operated through numerous separate entities, one of which, Monaco Management, Inc. ("Monaco"), was formed specifically as a payroll company, and served as the centralized paymaster for the Evangelistas' other enterprises.

The family's real estate holdings, including rental, commercial, and residential properties, as well as unimproved land, expanded dramatically during the early 1980s. By 1986, the properties had an estimated gross fair-market value of $150–200 million. These holdings were highly leveraged, however, and vulnerable to market fluctuations; many were subject to 100% financing or had been financed through "cross-collateralization," whereby income-producing properties were used as collateral to obtain financing for non-income producing properties. In the real estate market downturn of the late 1980s, the Evangelistas' holdings plummeted in value. By 1991, they had lost virtually all of their properties through foreclosures, and Evangelista, Sr. (according to his accountant's testimony) had a negative net worth of roughly $20–25 million.[3]

According to the Evangelistas, they became unable to pay the payroll withholding taxes and FICA contributions (collectively, "trust funds") owed in respect of their declining businesses. In any event, they stopped paying. Their total liability to the IRS eventually reached more than $1.5 million, most of which was owed by Monaco, the paymaster company. It is apparently uncontested that the Evangelistas (through Monaco) consistently *filed* the appropriate quarterly tax return forms—"Forms 941"—showing the amount of trust funds that the various family businesses owed to the IRS. But beginning in late 1988, the Evangelistas stopped making the actual payments that the filed forms showed to be due and owing.

In late 1989, the IRS initiated enforcement actions to collect the unpaid trust funds reflected on Monaco's Forms 941. IRS officers filed liens against the Evangelistas' assets and executed levies against the known bank

2. References to "Appellant's Brief" indicate the brief of appellant Louis Evangelista, Sr.

3. The Evangelistas claim to have been "doubly rocked" because the market downturn coincided with an alleged embezzlement of several hundred thousand dollars by one of Evangelista, Sr.'s brothers, and an accomplice.

accounts of Monaco and the related businesses. In March 1990, the IRS and Monaco entered into a series of negotiations aimed at resolving the Evangelistas' trust fund delinquency. IRS agents advised one of the Evangelistas' accountants that no formal payment agreement could be reached until Monaco submitted financial statements demonstrating the Evangelistas' alleged inability to pay the funds; in addition, the agents advised the Evangelistas that remaining current on future payments was "always a prerequisite" to such an agreement. But Monaco never submitted the required financial statements; and the parties reached only informal understandings, through which Monaco and/or the Evangelistas voluntarily paid fractional amounts of the past-due trust funds. The IRS therefore continued its collection efforts—seizing the Evangelistas' assets and levying against their business bank accounts—and eventually recovered (as of March 1993) roughly $384,000 of the $1.5 million that had been reported on the Forms 941 but had been unpaid.

In the period 1989 through 1995, the Evangelistas engaged in a series of schemes that (according to the government) were designed to: (a) defeat collection of the trust funds by the IRS, and (b) prevent the IRS from seizing other family and business assets to satisfy the trust fund obligations. First, the Evangelistas repeatedly commingled personal and corporate funds, and then spent those monies on personal expenses and new businesses, thereby beggaring Monaco and the other entities that owed the trust fund payments. For example, the government showed that numerous checks payable to Evangelista, Sr. in respect of the family's businesses were deposited in personal checking accounts set up in the names of himself and his wife (jointly), and in the names of at least two of their children, including Claude Evangelista. On those personal accounts, hundreds of thousands of dollars in checks were drawn for (*inter alia*) mortgage and other expenses associated with at least two family residences; wedding expenses for Evangelista, Sr.'s two daughters; college tuition for a son and one daughter; and the lease payments and related expenses for a Mercedes Benz driven primarily by Evangelista, Sr.'s wife.

The Evangelistas frustrated seizure of other family assets by transferring ownership of those assets from family members who were personally liable for the overdue trust funds (chiefly Evangelista, Sr.) to those who were not. For example, title to Evangelista, Sr.'s personal residence was transferred to two of his children (jointly), and his $1 million partnership interest in one real estate enterprise was assigned to his son Claude. Once again, these intra-family transfers and personal expenditures took place while Monaco and other Evangelista entities owed the IRS over $1 million in past-due trust funds for which Evangelista, Sr. (at least) was personally liable.

The Evangelistas' defense was grounded almost entirely on the testimony of their long-time accountant, Martin Reffsin, who was their sole witness at trial. Reffsin testified about the organization of the Evangelistas' businesses and explained the financial difficulties that they encountered in the late 1980s and early 1990s. Reffsin also described his negotiations with the IRS on behalf of the Evangelistas, including his various unsuccessful efforts to work out an acceptable payment arrangement between the parties. The apparent thrust of the defense was to show that the Evangelistas and their family businesses had suffered financial hardship, and had endeavored—in good faith, and with assistance and advice from accounting professionals—to resolve those problems as best they could.

Nevertheless, Reffsin's testimony also makes clear that he consistently advised the Evangelistas (a) that they were personally liable for the outstanding trust funds and obligated to pay them; (b) that they had no right to use the trust funds for any purpose other than paying the IRS; and (c) that they should enter into an agreement with the IRS to begin at least partial payment of the funds. Most important, Reffsin never told Evangelista, Sr. *not* to pay the trust funds that were owed, nor did he advise that payment could be put off or deferred pending negotiation of a formal payment arrangement.

The jury found both Evangelistas guilty on all of the counts with which they were charged.

## DISCUSSION

We discuss separately each of the Evangelistas' four claims of error, turning last to the proper standard for conviction under 26 U.S.C. § 7202.

### A. Failure to Instruct on the Theories of Defense.

■ The Evangelistas argue that the district court erroneously refused to instruct the jury as to their four theories of defense, each of which (they contend) had an ample basis in the evidence: (i) that they did not willfully fail to pay the outstanding trust funds, but defaulted on the payments only because adverse financial circumstances left them unable to pay; (ii) that they did not intend to *evade* or *defeat* payment of the funds, but only to *defer* payment until their financial condition improved; (iii) that they relied on the advice of their accountant, Reffsin, that it would be permissible to defer the trust fund payments—in order to continue operating their businesses and paying their other obligations—while the parties worked out a formal payment agreement; and (iv) that they did not subjectively believe that their conduct in failing to pay the funds was unlawful. All of these theories are rooted in the well-established principle that convictions for tax offenses require proof of specific intent, *i.e.*, that the defendant violated the tax laws "willfully."

■ This Court has "repeatedly recognized a criminal defendant's right to a charge which reflects the defense theory." *United States v. Durham*, 825 F.2d 716, 718 (2d Cir.1987). This rule holds as to any theory "for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court." *United States v. Vazquez*, 113 F.3d 383, 386 (2d Cir.1997) (quoting *United States v. Dove*, 916 F.2d 41, 47 (2d Cir.1990)). Still, defendants

are "not necessarily entitled to have the exact language of the charge they submitted to the district court read to the jury." *Durham*, 825 F.2d at 719. Indeed, defendants are entitled only "to have instructions presented which adequately apprise[ ] the jury of the elements of the crime charged and their defense"—assuming of course that "their defense theory did have a basis in law and in the evidence." *Id.*

The district court refused to issue any of the specific instructions that the Evangelistas requested in respect of their theories of defense,[4] and instead issued a general "willfulness" instruction:

> I used two words a lot, willfully and knowingly. I'm now going to define them. An act is done willfully if it is done voluntarily and intentionally with intent to do something which the law forbids. That is to say, with purpose either to disobey or to disregard the law. An act is not done knowingly and willfully, if it is done as a result of some innocent or legitimate reason, or for some other purpose than to defeat the collection and payment of withholding, payroll and income taxes.

As the Supreme Court said in *United States v. Pomponio*, 429 U.S. 10, 13, 97 S.Ct. 22, 24, 50 L.Ed.2d 12 (1976) (per curiam), such a charge, in a tax case, "adequately instruct[s] the jury on willfulness." *Pomponio* expressly approved an almost identical instruction that defined a willful act "as one done 'voluntarily and intentionally and with the specific intent to do something which the law forbids, that is to say with [the] bad purpose either to disobey or to disregard the law.' " *Id.* at 11, 97 S.Ct. at 23 (alteration in original).

In the factual setting of this case, we conclude that the Evangelistas were not entitled to *additional* instructions corresponding specifically to their proffered theories of defense. Our reasons are as follows.

#### 1. Reliance-on-Advice Theories

■ All of the Evangelistas' defense theories are premised upon their good-faith reli-

---

4. The Evangelistas requested instructions as to, *inter alia*, the "specific intent" requirement in tax-offense cases; the "good-faith belief" de-

fense; the implications of a defendant's "inability to pay" his taxes due to financial constraints; and the "defense of reliance on advice."

ance on Reffsin's advice that they could lawfully defer paying the trust funds—that is, cease making payments altogether—while they worked out a formal arrangement with the IRS; but such reliance-on-advice defenses lack any basis in the evidence. The Evangelistas assert that "Reffsin expressly testified that he advised Evangelista that he could defer the payment of taxes in order to keep his businesses going until such time as a payment schedule could be agreed upon with the [IRS]." Appellant's Brief at 22. The record is clear, however, that Reffsin never advised the Evangelistas that withholding payment, pending negotiation of a payment agreement, was legally permissible. Reffsin's testimony reflects that he gave precisely the opposite advice, and that the Evangelistas simply failed to follow it:

Q: Did you ever tell Mr. Evangelista *not* to pay his payroll taxes?

A: No.

Q: What did you tell him?

A: I told him that *he should start paying something*, at least if he can't pay it all, *pay something*.

Q: Did you tell him that he could pay it over a period of time?

A: I told him that we can *probably make an arrangement* with the [IRS] to pay it over a period of time.

(Emphasis added.) Reffsin reiterated this testimony when he was again asked whether he had "advise[d] Mr. Evangelista that he could pay these [trust fund] taxes over a period of time."

A: Yes. I advised him that generally the [IRS] *would permit* him to pay it out over a period of time.

Q: And you did advise him [of] that, *at the time* that these *taxes were due?*

A: *Yes.*

(Emphasis added.)

■ Reliance on advice, offered as a defense, "presupposes the defendant's solicitation of advice in good faith." *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir.1989) ("advice-of-counsel" defense) (citing *Williamson v. United States*, 207 U.S. 425, 453, 28 S.Ct. 163, 173, 52 L.Ed. 278 (1908)). Moreover, the Supreme Court

has placed its imprimatur on the following instruction as "the most favorable to the defendant that may be given" in a case defended on that ground:

[I]f a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do ..., and fully and honestly lays all the facts before his counsel, and *in good faith and honestly follows such advice,* relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime [sic] which involves willful and unlawful intent....

*Id.* at 1194–95 (quoting *Williamson*, 207 U.S. at 453, 28 S.Ct. at 173) (emphasis added). The Evangelistas were not entitled to such an instruction here, regardless of their good faith in *seeking* Reffsin's advice, because it cannot be argued on this record that they "in good faith and honestly *follow[ed]*" the advice that Reffsin gave.

Reffsin's testimony was unequivocal: there is no mention whatever of "deferring" payment during negotiation of a payment agreement; and nothing in the record suggests that Reffsin advised the Evangelistas that the possibility of structuring such an agreement relieved them of their current and pressing obligation to pay. To the contrary, the Evangelistas were told to "start paying"—forthwith—"at least ... something" of what they owed the IRS, and in addition to "make an arrangement" whereby the full amount of the funds could eventually be paid "over a period of time." But the Evangelistas never negotiated a formal payment "arrangement" with the IRS, at least in part because they refused to meet the conditions for such an arrangement; they never made partial payments under an informal plan (with the exception of a very few, small payments made early on); and they never came close to paying the full amount of trust funds that were owed to the IRS.

■ In short, the Evangelistas did not follow Reffsin's advice. Thus there was no basis in the evidence for the Evangelistas' reliance-on-advice defense, and they were not as a matter of law entitled to an instruction

specifically apprising the jury of that theory.[5] Because, as we conclude, the Evangelistas' other defense theories also presuppose their reliance on Reffsin's advice, the district court's refusal to instruct on those specific theories was correct as well.

### 2. *Subjective Belief of Compliance with the Code*

■ The Evangelistas nevertheless argue that under *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), the district court was required to instruct the jury as to the Evangelistas' alleged "good faith belief that [their] conduct did not violate the [IRS] laws." Appellant's Brief at 24. We have previously explained that *Cheek* "made clear that a trial court may not instruct a jury that, to negate the knowledge component of the willfulness requirement, a defendant's good faith belief that the tax laws did not impose any duty on him must be objectively reasonable." *United States v. Pabisz,* 936 F.2d 80, 83 (2d Cir.1991); *see also Cheek,* 498 U.S. at 203, 111 S.Ct. at 611 (rejecting the lower court's "requirement that a claimed good-faith belief must be objectively reasonable if it is to be considered as possibly negating the Government's evidence purporting to show a defendant's awareness of the legal duty at issue").

On the basis of *Cheek,* the Evangelistas sought an instruction stating in part:

> If, in good faith a defendant truly believed that he could pay other debts and conduct transactions, while deferring payment to the IRS, then such defendant cannot be guilty of tax evasion. The defendant's good faith belief need not be ob-

jectively reasonable for you to find the defendant not guilty of tax evasion.... If you find that a defendant truly believed, in good faith, that his conduct did not violate [IRS] laws, then such defendant did not have the requisite intent to be convicted of the tax offenses charged and you must find that defendant not guilty.

We conclude that in the circumstances of this case, the district court committed no error in refusing to give that instruction.

The Evangelistas' defense of good faith—whether objectively reasonable or not—is wholly based (once again) on the advice of their accountant Reffsin. They argue, for example, that "Evangelista[, Sr.] subjectively believed, in reliance upon the fact that he was acting with the knowledge and approval of his accountant, that he was not committing criminal violations of the tax laws." Appellant's Brief at 23. But Reffsin's advice was to the contrary. Although he advised that the IRS might be persuaded in negotiations to accept an arrangement under which the trust fund payments could be stretched out over time or reduced, the critical and unambiguous premise of that advice is that nonpayment of the trust funds was inconsistent with the Evangelistas' legal obligations under the tax code.

Thus the record supports at most that the Evangelistas in good faith believed that they could *negotiate for a dispensation from criminal prosecution;* that is not at all the same as a good-faith belief that their conduct was lawful. The Evangelistas' invocation of *Cheek* was therefore misplaced, and they were not entitled to a good-faith instruction on this record.[6] *Cf. Pomponio,* 429 U.S. at

---

5. Even to the extent that Reffsin's advice could be construed to suggest that indefinite deferral of payment was permissible (a dubious proposition), we think that the district court's general willfulness instruction was sufficient to apprise the jury of the Evangelistas' reliance-on-advice theory. *See United States v. Kelley,* 864 F.2d 569, 573 (7th Cir.1989) (affirming conviction for willfully filing false tax return because district court's "instructions on willfulness necessarily encompassed [the defendant's] theory of good faith reliance on counsel's advice").

6. For similar reasons, the Evangelistas' reliance on our decisions in *Pabisz* and *United States v. Regan,* 937 F.2d 823 (2d Cir.1991), is also

flawed. In *Pabisz,* the district court's good-faith instruction—stating that the jury should consider whether "the defendant [was] *reasonable* in having a good faith belief that the income tax law did not apply to him," 936 F.2d at 82 (emphasis added)—directly contradicted *Cheek* 's mandate that a defendant's subjective belief *not* be gauged according to its "objective[] reasonable[ness]." *Cheek,* 498 U.S. at 202, 111 S.Ct. at 611. In *Regan,* we held that a general good-faith charge "was insufficient to instruct the jury concerning appellants' specific good faith defense" in the circumstances of *that* complex case, "where appellants were charged with sixty-four counts covering the waterfront of tax fraud, securities

13, 97 S.Ct. at 24 (after the trial judge "adequately instructed the jury on willfulness[,] . . . [a]n additional instruction on good faith was unnecessary").

### 3. *Financial Condition*

We likewise reject the Evangelistas' argument that they were entitled to an instruction stating that they could not be found guilty of willfully failing to pay the trust funds unless the government proved that they had "sufficient funds to be able to meet [their] legal obligation[s]." They cite *United States v. Poll*, 521 F.2d 329 (9th Cir.1975), in support of their claim; but under that case, the government, in order to establish willfulness, must prove

> that at the time payment was due the taxpayer possessed sufficient funds to enable him to meet his obligation *or that the lack of sufficient funds on such date was created by (or was the result of) a voluntary and intentional act without justification in view of all the financial circumstances of the taxpayer.*

*Id.* at 333 (emphasis added). The instruction was properly denied in these circumstances, where despite the Evangelistas' claim that financial hardships prevented them from making trust fund payments, they nevertheless found sufficient resources to "voluntar[ily] and intentional[ly]" make mortgage payments on multiple personal residences, pay for their children's weddings and college tuitions, and lease a luxury automobile.

### B. *Applicable Statute of Limitations for 26 U.S.C. § 7202.*

The Evangelistas argue that the statute of limitations for offenses under 26 U.S.C. § 7202 is three years, rather than the six-year period of limitations applied by the district court. (Under the shorter period, most of the § 7202 charges are untimely.) Without setting forth the particulars of that argument—which is based on the general three-year limitations provision for prosecution of tax offenses, 26 U.S.C. § 6531—it is enough to say that this Court addressed the identical claim in *United States v. Musacchia*, 900 F.2d 493, 500 (2d Cir.1990), and unequivocally "conclude[d] that a six-year statute of limitations applies to the offense defined by 26 U.S.C. § 7202." The Evangelistas "respectfully submit that the panel decision in *Musacchia* [was] in error," Appellant's Brief at 42, but they make the same legal arguments and cite the same cases that this Court carefully considered in 1990, and rejected. *See Musacchia*, 900 F.2d at 500 (finding unpersuasive the reasoning of *United States v. Block*, 497 F.Supp. 629 (N.D.Ga.), *aff'd*, 660 F.2d 1086 (5th Cir.1981), cited in Appellant's Brief at 42–43).

As the Evangelistas point out, *Musacchia* was vacated in relevant part, *see* 955 F.2d 3, 4 (2d Cir.1991), because the government—"after further study and consultation with the [IRS]"—became "convinced that § 7202 d[id] not apply to the gasoline taxes at issue" in that case, and therefore moved to vacate those convictions "in the interest of justice." *Id.* To the extent that the statute-of-limitations question remains open in this Circuit, we hereby reaffirm the holding of the original *Musacchia* opinion that "a six-year statute of limitations applies to the offense defined by 26 U.S.C. § 7202." 900 F.2d at 500. *See also United States v. Gollapudi*, 947 F.Supp. 763, 766 (D.N.J.1996) (finding "the Second Circuit's reasoning in *Musacchia* to be more persuasive than the district court's reasoning in *Block*").

### C. *Improper Prosecutor's Comment.*

During the government's cross-examination of Reffsin, Evangelista, Sr. audibly answered "yes" in response to the prosecutor's pending question. The prosecutor reacted by saying: "I call Louis Evangelista to the stand." Judge Wexler immediately told the prosecutor to sit down, and admonished Evangelista, Sr. to "keep [his] mouth quiet." Then, at defense counsel's request, Judge Wexler convened a side-bar with all counsel, and promptly thereafter instructed the jury: "A statement was made by the defendant and a statement was made by the prosecu-

---

fraud, mail and wire fraud, conspiracy, and RICO." 937 F.2d at 826–27. *Regan* does not control this case, where the Evangelistas simply

defaulted on a direct and unambiguous obligation to pay $1.5 million in payroll taxes.

tion. Disregard them both. I think that it was in the heat of excitement where it came out, it should not have come out. They were both wrong. So disregard it." The defense made no contemporaneous objection to the court's curative instruction.

The Evangelistas claim that this "egregious act of prosecutorial misconduct .... amounted to a deliberate effort to undermine [their] constitutional rights" not to testify, and was "in no way cured by the District Court's instruction" to the jury. Appellant's Brief at 40.[7]

This Court has stated that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding[;] ... such remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *United States v. Friedman,* 909 F.2d 705, 709 (2d Cir.1990) (quoting *United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)) (internal quotations omitted). "In making this assessment, this Court has focussed primarily on three factors: the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct." *United States v. Melendez,* 57 F.3d 238, 241 (2d Cir.1995).

Under this standard, the prosecutor's comment—while plainly improper—does not warrant reversal. We agree with the government that the comment ultimately had no prejudicial effect on Evangelista, Sr., or on his son Claude, when considered in light of the district court's immediate curative instruction and the weight of evidence against both defendants.

The severity of the prosecutor's single improper statement was also "mitigated somewhat in this case because the remark appears to have been an aberration in an otherwise fair proceeding." *Id.* "[M]ost of the cases in which we have reversed convictions as a result of prosecutorial misconduct have involved repeated improper statements whose aggregate effect was more likely to under-

mine the fairness of the trial." *Id.* The prosecutor's statement here had no bearing on the credibility of the defense witness on the stand at the time, or on the validity of the evidence against the Evangelistas. We emphasize that there is no one-free-bite rule for prosecutors, but the record reflects and supports Judge Wexler's view that the comment was a heated, momentary response to provocation rather than a tactical move. In short, the prosecutor's comment is an insufficient ground for reversal.

### D. *Proof Required for Conviction Under § 7202.*

 As indicated at the outset, we write chiefly to address a question of statutory interpretation regarding the requirements for conviction under § 7202. That statute, entitled "Willful failure to collect or pay over tax," provides in relevant part: "Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall ... be guilty of a felony...." 26 U.S.C. § 7202.

The Evangelistas argue that § 7202 defines two offenses, expressed schematically as follows:

 the willful failure to collect trust fund taxes, and

 the willful failure to—

[a] truthfully account for, and

[b] pay over such taxes.

According to the Evangelistas, the second of these offenses—the only one at issue here— requires proof of two discrete elements: *both* a willful failure to "truthfully account for" trust funds, *and* a willful failure to "pay over" those funds. Appellant's Brief at 36 (quoting 26 U.S.C. § 7202). The Evangelistas argue that because they consistently *filed* the required Forms 941 tax returns—as the government apparently concedes—they *did* "truthfully account for" the trust funds that they owed; and therefore the government failed as a matter of law to prove both elements of the crime under § 7202.

---

7. Claude Evangelista makes no separate or additional argument regarding any possible independent prejudice to his case stemming from this incident.

The government counters that under "[a] fair reading of the statute and the legislative history" of § 7202, "Congress intended that an employer ... perform all three duties, namely, (1) collection of trust fund taxes, (2) truthful accounting for trust fund taxes and (3) paying over to the government trust fund taxes." Appellee's Brief at 33. In the government's view, the "account for and pay over" provision of § 7202—even assuming that the statute defines two separate offenses—is therefore violated by the willful failure to perform *either* the duty to account or the duty to pay.

These competing interpretations of § 7202 raise a question of first impression in this Circuit. We agree with the government that the plain language of the disputed passage in § 7202 creates a dual obligation—to "truthfully account for and pay over" trust fund taxes—that is satisfied only by fulfilling *both* separate requirements. Accordingly, the command of the statute is violated by one "who willfully fails" *either* to "account for" *or* to "pay over" the necessary funds.

We find support for our view in one of the few published decisions to consider this issue. The argument raised here by the Evangelistas was also presented in *United States v. Brennick*, 908 F.Supp. 1004 (D.Mass.1995), and was rejected in persuasive terms by that court. Preliminarily, the *Brennick* court read § 7202 much the same as we do: "The phrase 'truthfully account for and pay over' is ... unambiguously conjunctive. Somebody who was required to 'truthfully account for and pay over' a tax would be required to do both things to satisfy the requirement"; therefore, "any intentional failure to complete the required task (to truthfully account for and pay over the tax) constitutes a crime." *Id.* at 1016.

We agree as well with the *Brennick* court's conclusion that:

the only plausible reading of the plain language of the statute penalizes the failure to complete the duty imposed by law: truthfully accounting for and paying over the withholding tax collected by an employer. The alternative reading is inconsistent with any reasonable understanding of the purposes of the statute. It would result in a greater penalty for one who simply failed to collect trust fund taxes than for one who collect[ed] them and, as is charged here, used them for his own selfish purposes ..., so long as he notified the IRS that he had collected the tax. That Congress intended to make such a distinction is simply inconceivable.

*Id.* at 1017.

In arguing the contrary position, the Evangelistas rely on two opinions by panels of the Ninth Circuit, *United States v. Poll*, 521 F.2d 329 (9th Cir.1975) (following *Wilson v. United States*, 250 F.2d 312 (9th Cir.1957)). We are aware of no other authority that even remotely supports the Evangelistas' interpretation of § 7202. The Ninth Circuit in *Poll* stated, in the last line of a long footnote appended to the last sentence of the opinion, "We continue to regard the crime [under § 7202] as requiring two failures to act, willful failure to truthfully account *and* willful failure to pay over." *See* 521 F.2d at 335 n. 3 (emphasis in original). As *Brennick* points out, this statement is dicta. *See Brennick*, 908 F.Supp. at 1015. *Poll* was not concerned with whether proof of two elements (failure to "account for and pay over") was required; the only issues in *Poll* were how to define "willfulness" under § 7202, and what evidence could be adduced to show it. *See, e.g., Poll*, 521 F.2d at 331. The most that can be said is that *Poll* (and *Wilson*) assume without analysis that § 7202 (and its predecessor statute in *Wilson*) require both a willful failure to account for and a willful failure to pay over.

The Evangelistas' final argument is based on a comparison between § 7202 and 26 U.S.C. §§ 7215 and 7512. Section 7215 provides that it is a *misdemeanor* to fail to comply with § 7512, which in turn penalizes anyone who "fails to collect, truthfully account for, *or* pay over such tax." 26 U.S.C. § 7512(a)(1). The Evangelistas argue that the use of the disjunctive ("or") in § 7512, violation of which is punished as a misdemeanor, demonstrates that Congress used the conjunctive ("and") in § 7202 for the purpose of adding an element to an offense that is punished as a felony. No such labored analysis is needed to account for the

distinction in penalty, which can be attributed to the fact that the felony offense under § 7202 entails the element of "willfull[ness]," while the misdemeanor under §§ 7215 and 7512 does not.

In sum, we hold that the government satisfies the requirements for conviction under § 7202 when it proves beyond a reasonable doubt that the defendant willfully failed *either* to "truthfully account for" *or* to "pay over" the required trust fund taxes.[8]

## CONCLUSION

We have considered all of the Evangelistas' arguments challenging their convictions, and find them to be without merit. The judgments of conviction for both Louis Evangelista, Sr. and Claude Evangelista are therefore affirmed.

---

8. We note that the district court in fact charged the jury in accordance with the standard that we expressly adopt here. Judge Wexler stated (in relevant part) that in order for the jury to find that the Evangelistas had violated § 7202, the government had to prove beyond a reasonable doubt that "the defendant[s] failed to comply with [the statutory] duty by failing to truthfully account for and pay over the Federal taxes in that, *although having truthfully accounted for* [the] Federal taxes described in the indictment . . ., [they] *failed to pay over* such Federal taxes." (Emphasis added.)