18-2007-cr
*United States v. Gramins*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2018

(Argued: November 27, 2018          Decided: September 20, 2019)

No. 18-2007-cr

———————————————————

UNITED STATES OF AMERICA,

*Appellant*,

-v.-

MICHAEL GRAMINS,

*Defendant-Appellee.*[1]

———————————————————

Before:          LIVINGSTON, CARNEY, and SULLIVAN, *Circuit Judges*.

Michael Gramins, a trader of Residential Mortgage-Backed Securities ("RMBS"), was convicted of conspiracy to commit wire fraud and securities fraud by a jury in the United States District Court for the District of Connecticut. At Gramins's trial, the district court had admitted testimony from one of Gramins's counterparties tending to establish that the counterparty credited Gramins's representations when Gramins acted as a "broker" between two counterparties.

---

[1] The Clerk of Court is respectfully instructed to amend the caption as set forth above.

Shortly following Gramins's conviction, we decided *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"), which held in the context of a similar prosecution that the erroneous and idiosyncratic viewpoint of a defendant's counterparty could not be relevant to the objective, "reasonable investor" standard for materiality in a securities fraud prosecution. The district court (Chatigny, *J.*) then sought to apply our holding in *Litvak II* to this case, and granted Gramins's motion for a new trial on the basis that counterparty testimony had been improperly admitted against Gramins at trial. We conclude, however, that the counterparty testimony at Gramins's trial was not improperly admitted and did not implicate our holding in *Litvak II*. Accordingly, the judgment of the district court is REVERSED and the case is REMANDED to the district court with instructions to reinstate the conviction.

FOR APPELLANT:                   HEATHER CHERRY, Assistant United States Attorney (David E. Novick, Jonathan N. Francis, Sandra S. Glover, Assistant United States Attorneys, *on the brief*), *for* John H. Durham, United States Attorney for the District of Connecticut, New Haven, CT, *for the United States of America*.

FOR DEFENDANT-APPELLEE:          MARC L. MUKASEY (Jeffrey B. Sklaroff, *on the brief*), Greenberg Traurig, LLP, New York, NY, *for Michael Gramins*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

On June 15, 2017, a jury in the United States District Court for the District of Connecticut convicted Defendant-Appellee Michael Gramins of conspiracy to commit wire fraud and securities fraud. Gramins and his alleged co-conspirators, former traders of Residential Mortgage Backed Securities ("RMBS") at Nomura Securities International, Inc. ("Nomura"), lied to their counterparties

2

about contemporaneous price negotiations with other, third-party counterparties. Those lies caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so. The counterparties believed that they were adjusting their bids or offers in response to *bona fide*, contemporaneous negotiations with those other, third-party counterparties, and paying Nomura a modest commission to facilitate supposedly "riskless" transactions with those counterparties. In reality, Gramins's false statements carved out sizable spreads between Nomura's buying-counterparties' bids and its selling-counterparties' offers, allowing Nomura to reap substantial profits unbeknownst to the counterparty on either side of the transaction.

At Gramins's trial, the government elicited testimony from several of Nomura's counterparties that Gramins's and his alleged co-conspirators' lies were important to their investment decisions—in other words, that those misrepresentations were "material." Shortly after the jury's guilty verdict, we held in *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"), that the admission of testimony from a counterparty who erroneously asserts the existence of an agency relationship between himself and his broker-dealer unduly prejudices the jury on the issue of materiality, violating Federal Rules of Evidence

3

("FRE") 401 and 403 and requiring a new trial. Following the issuance of our decision in *Litvak II*, Gramins supplemented his pending motion for a new trial, arguing that one of the government's witnesses at his trial—Joel Wollman of QVT Financial—had implied (without explicitly stating) an erroneous belief in the existence of an agency relationship between himself and Gramins. The district court (Chatigny, *J.*) then granted Gramins's motion for a new trial, citing *Litvak II*. We REVERSE the district court's order and REMAND to the district court with instructions to reinstate the conviction and proceed to sentencing.

**BACKGROUND**

**I.**

Gramins's conspiracy capitalized on certain distinctive features of the market for RMBS. As noted above, "RMBS" stands for Residential Mortgage-Backed Securities. RMBS are "large and complex aggregations of residential mortgages and home equity loans." *Litvak II*, 889 F.3d at 59. Banks typically create RMBS by packaging together groups of mortgages and issuing bonds backed by the principal and interest payments of the homeowners who received the mortgages. Investors assess the value of RMBS in part by estimating the probability of repayment or default on the various loans that comprise them.

4

RMBS are priced in terms of percentage of face value, with the face value of each RMBS derived from the value of its component mortgages. Investors negotiate RMBS prices in small increments called "ticks," with one tick equal to 1/32 of a percentage point of the bond's face value. Thirty-two ticks therefore equal one full percentage point of face value, or one penny on every dollar of face value. So, for instance, if Nomura agreed to buy a RMBS for "65 and 16 ticks," it agreed to pay 65.5% of the face value of that bond.[2]

RMBS are "bought and sold at very high prices" and, as a result, typically "marketed to large, sophisticated financial institutions" like banks and hedge funds. *Litvak II*, 889 F.3d at 60. Given the large size and unique features of each RMBS, the RMBS market lacks an "exchange" of the sort on which traditional corporate stocks and Treasury bonds trade. Moreover, the price at which a given RMBS will trade is generally not publicly known. Consequently, institutional investors looking to transact in RMBS must "contact registered broker-dealers . . . to find interested buyers or sellers," or transact "directly with [the] broker-dealers" from the broker-dealers' own accounts. *Id.*

---

[2] Throughout this opinion, we express the prices of various RMBS with hyphens, such that a price of 65 and 16 ticks appears as "65-16."

Enter Gramins. Between 2009 and 2013, Gramins traded RMBS at Nomura, a broker-dealer registered with the Securities and Exchange Commission. Institutional investors frequently reached out to Nomura when looking to buy or sell a particular security. Gramins and his fellow traders would respond to expressions of interest from Nomura's customers by transacting with the customers from Nomura's own inventory or by communicating with other institutional investors in the hopes of finding a counterparty willing to complete the desired transaction.

More often than not, Nomura took the latter approach. Brokers like Gramins would attempt to match a prospective buyer of a particular RMBS with a prospective seller of that RMBS (and vice versa), reaping a small commission in return. Industry participants refer to this function alternatively as "facilitating," *see* J.A. 191, 642, 734, "market making," *see* J.A. 517, 544, and "riskless trading," *see* J.A. 194, 252. The last term reflects the fact that, because Nomura "had the potential buyer and potential seller already matched up at the time of the transaction," J.A. 194, it had practically eliminated any of the "market risk" associated with holding the security on its own books, J.A. 252.

6

Participants in the RMBS market distinguish among three types of RMBS transactions. First, in the "order trade" scenario described above, "a broker-dealer communicates [separately] with an interested buyer and seller and, if successful, effectuates a transaction in which a RMBS is transferred." *Litvak II*, 889 F.3d at 60. In an order trade, "[t]he broker-dealer owns the bond, but usually briefly, in consummating the transaction between the two investors." *Id*. Second, in a "BWIC" ("Bids Wanted In Competition") trade, "a putative seller sends a bid-list to multiple broker-dealers," who then "solicit expressions of interest and price ranges from potential buyers" and "place[] a bid in the auction of [that] particular security." *Id.* Both of these types of trades fall within the "riskless" category because the broker-dealer "ha[s] the potential buyer and potential seller already matched up at the time of the transaction." J.A. 194. Moreover, in both contexts, the broker-dealer typically obtains compensation for its "matching" efforts by selling the bond for slightly more than it paid for it. Industry participants refer to this difference as "commission," "pay on top," or "spread," J.A. 195, 196, 580, and often negotiate the amount of the difference explicitly with the broker-dealer.[3]

---

[3] A typical (market-standard) commission is eight ticks, or 0.25% of a bond's face

A third type of transaction has different features. In a so-called "inventory trade," an investor "buys a bond already held in a broker-dealer's account" at the time of the parties' negotiations. *Litvak II*, 889 F.3d at 60. In that context, the broker-dealer *has* incurred market risk by holding the RMBS in its inventory for a significant period of time prior to the transaction. And in that context, customers do *not* pay any additional commission because the broker-dealer has transacted directly from its own inventory—presumably, seeking maximum profit or minimum loss on its earlier investment in the bond—rather than intermediating between two interested counterparties.

Nevertheless, while industry participants frequently distinguish among these three types of trades, the same agency law principles apply to all of them. "An essential feature of all of these trades . . . is that the broker-dealer acts solely in its own interest as a principal." *Id.* at 61. As a matter of accounting, the broker-dealer's profit in any of the three scenarios outlined above is *always* simply the difference between the price at which it sold the security and the price at which it purchased it. *See id.* Moreover, while some RMBS transactions may be effectively "riskless" in practice, the broker-dealer *always* assumes *some* risk in the

value.

8

transaction, because "an institutional investor can refuse to purchase a bond held by the broker-dealer even when the investor caused the broker-dealer to purchase it by an expression of interest . . . ." *Id.* Consequently, "[a] broker-dealer is not . . . an agent for its counterparties in these trades," and the final price in any transaction between broker-dealer and counterparty "is determined in an arms-length negotiation" between the two. *Id.*

**II.**

Having outlined the relevant features of the RMBS market, we turn now to Gramins's conspiracy to manipulate it. At trial, the government proved its conspiracy charge against Gramins with the following evidence. First, three of Gramins's co-conspirators—former RMBS traders at Nomura—testified to the nature of the scheme. Caleb Chao, a former junior analyst at Nomura, explained that Gramins and others would "misrepresent . . . prices to clients," for instance by "tell[ing] the seller that we were seeing a bid that was lower than what the bidder had actually bid" or "tell[ing] a bidder that we had an offer that was higher than the offer actually was." J.A. 580. Chao testified that the effect of these representations "was to get either one side or both sides to lower their offer [to sell] or increase their bid [to buy]," thereby "increas[ing] the spread or money that

9

Nomura earned on the trade." J.A. 580–81. Chao testified that Gramins had taught him to engage in these deceptive tactics and that he had observed Gramins engaging in them himself.

Frank Dinucci, a former vice president at Nomura, provided similar testimony. Dinucci explained that he and other Nomura RMBS traders "would lie about where we were actually buying or selling securities to clients" in order to "increase the profit for Nomura." J.A. 199. Dinucci testified that these misrepresentations induced Nomura's counterparties to adjust their bid or offer prices because those counterparties "typically only had the information that we were giving them regarding price" and thus "basically had to take our word when it came to the actual price on the bond." J.A. 200. Like Chao, Dinucci testified that he had originally learned these deceptive tactics from Gramins and that he had observed Gramins himself engage in them. Alejandro Feely, a former associate at Nomura, described the RMBS trading desk's trading tactics in a similar manner. Both Dinucci and Feely testified that Nomura's RMBS traders would engage in these tactics "on a daily basis." J.A. 200, J.A. 642.

The government then introduced evidence of several specific RMBS trades to further demonstrate Gramins's role in the conspiracy. All of these trades fell

10

within the first two types of trades described above (order and BWIC trades) rather than the third (inventory trades). On January 5, 2010, for instance, Gramins facilitated an order trade of AHMA 2007-1A1 ("AHMA") bonds between Joel Wollman of QVT Financial and Chris Creed of Goldman Sachs Asset Management. Over instant message—a typical means of communication between broker-dealers and institutional investors, *see* J.A. 192, 240, 335, 441—Gramins raised the subject of the AHMA bonds with Wollman and confirmed that Wollman owned some amount of them. Gramins then told Wollman: "guy looking to add a bit of this . . . wants me to show a few holders a 46 bid." Gov't Ex. 10J.[4] Wollman then offered to sell the AHMA bonds at 47-16. Several minutes later, but before initiating any conversation with Creed, Gramins replied to Wollman, "ok, can show you a 46-16 bid on the ahma," Gov't Ex. 10J, as if Creed had increased his bid in response to Wollman's offer. Wollman responded to Gramins by lowering his offer price to 47-08.

Only then did Gramins message Creed, writing: "hey chris . . . have a matcher for you." Gov't Ex. 10C. When Creed expressed interest, Gramins

---

[4] Exhibits not contained in the Joint Appendix ("J.A.") are cited by the exhibit number used at trial, and may be accessed through the Second Circuit Records Office.

11

inflated Wollman's 47-08 offer price to 49-00, telling Creed: "being offered 33mm ahma 07-1 a1 @ 49-00." Gov't Ex. 10C. Gramins and Creed discussed the bond for a few minutes. Before receiving any bid from Creed (but after suggesting to Creed that he bid above 48-00), Gramins resumed his chat with Wollman, telling the latter "i have really been pushing this guy on ahma . . . / he says 47-00 is best best, otherwise wants me to move onto other holders." Gov't Ex. 10J. Wollman then agreed to sell his bonds at 47-00.

Gramins then returned to his chat with Creed. When Creed suggested 48-12 and 48-20 as possible bids, Gramins replied: "happy to show what you want, but honestly dont think this guy is gonna budge," referring to the fictitious 49-00 offer he had previously conveyed. Gov't Ex. 10C. Creed then told Gramins he would "pay the 49" if necessary, but would prefer to pay less if possible. Gov't Ex. 10C. Minutes later—and without any intervening interactions with Wollman, who had already agreed to sell at 47-00—Gramins told Creed: "chris this guy isn't moving at all . . . wants to just stick to his guns . . . so is 49-00 ok?" Gov't

Ex. 10C. Creed agreed to pay 49-00. Nomura then purchased the AHMA bonds for 47-00 and sold them for 49-00, taking a 64-tick commission.

On February 9, 2011, Gramins engaged in similar conduct while brokering a trade of WAMU 2005-AR15 A1C3 ("WAMU") bonds between PK Banks of DW Investments and Jordan Rieger of Monarch Alternative Capital. Gramins began by contacting Rieger about the WAMU bonds that Rieger owned. Gramins recommended a range in which Rieger might sell the bonds, but then clarified: "happy to reflect what you like / and i am purely looking to broker." J.A. 1337. Rieger offered to sell the bonds at 52-24. One minute later, Gramins inflated that offer price in a conversation with Banks, telling the latter, "have an order on [the WAMU bond] @ 53-16." J.A. 1328. Banks bid 51-16 in response.

Moments later, Gramins misrepresented Banks's bid back to Rieger, telling Rieger, "i have 51-00 bid." J.A. 1338. Rieger reacted by lowering his initial offer to 51-28. One minute later, Gramins lied to Banks, telling him, "have the wamus down to 53-00 now." J.A. 1329. Banks reacted by raising his bid to 52-00. At this point, even though Banks's bid of 52-00 now exceeded Rieger's offer of 51-28, Gramins continued to simulate an ongoing negotiation to both counterparties. He misstated Banks's bid to Rieger, telling the latter "ok . . . i am trying to push

13

him more but have 51-16 [from the buyer]." J.A. 1338. This time, Rieger declined to lower his offer and told Gramins to "keep working." J.A.1338. Nevertheless, a few minutes later, Gramins told Banks, "I have 52-24 now." J.A. 1330. Banks then raised his offer again. Banks's ultimatum to Gramins—"best @ 52-04 . . . paying you 52-10 all in," J.A. 1333—indicated that he understood Gramins to be making a 6-tick commission for facilitating the trade. Several minutes later, though, Nomura bought the WAMU from Rieger at 51-20 and sold it to Banks at 52-10, taking a 22-tick commission.

On March 16, 2011, Gramins employed similar practices while soliciting a bid from Wollman in the context of a BWIC auction of INDX 2005-AR14 A1B2 ("INDX") bonds. After Gramins informed Wollman of the BWIC opportunity, Wollman bid on the bonds, stating that he "would take a shot at 18-1." J.A. 1346. Wollman asked Gramins, "you gonna use?" J.A. 1346. Gramins confirmed that he would use Wollman's bid, telling him: "yes using." J.A. 1346. Several minutes later, Gramins informed Wollman that the bid had been successful. **JA1347**. As the evidence showed, however, Gramins did *not* in fact use

14

Wollman's bid of 18-01. Instead, Gramins bid only 17-17, won the auction anyway, and purchased the INDX at that price.

Gramins continued deceiving Wollman after the auction had finished. With respect to the amount of commission to be paid, Wollman asked Gramins if he could "do something like 18-5" given the low price of the bond. J.A. 1347. Based on the 18-01 price that Wollman thought Nomura had paid, Wollman's proposal would have netted Nomura a four-tick commission. Several minutes later, though, Gramins pushed back on that proposal, noting that he (Gramins) would have been "happy to buy [the INDX] at 19," and asking Wollman, "do you mind sticking w the qtr pnt?" J.A. 1350. Wollman agreed to Gramins's request and paid Nomura 18-09, which he believed would net Nomura a market-standard eight-tick commission. But because Nomura had bid only 17-17 for the bond, rather than using Wollman's bid of 18-01, Gramins reaped a 24-tick commission from Wollman's purchase.

Caleb Chao also testified to an order trade that he and Gramins brokered jointly on May 1, 2012. Chao testified that he sat to Gramins's immediate left on Nomura's trading desk, and that Gramins instructed him on how and what to communicate to clients while brokering trades. While Chao instant messaged the

15

buyer (Aadil Abbas of Hartford Investment Management Company ("HIMCO")), Gramins messaged the seller (Gabe Sunshine of Bracebridge Capital). Gramins began by alerting Sunshine to a potential trade of PPSI 2004-WWF1 M3 ("PPSI") bonds, saying "gonna have a bid for you shortly." J.A. 1495. One minute later, Chao engaged Abbas regarding those same bonds and Abbas bid 78-22. One minute after Chao received Abbas's bid, Gramins messaged Sunshine, "78 bid." Sunshine responded by offering to sell all his PPSI bonds at 78-16.

Even though, at that point, Abbas's bid (78-22) exceeded Sunshine's offer (78-16), Nomura did not execute the trade. Instead, a few minutes after Gramins had received Sunshine's offer, Chao falsely stated to Abbas, "seller came back to us with an 80-16 offer." J.A. 1498. Abbas raised his bid to 79-00 in response. Chao then told Abbas that the seller "usually likes to engage so dont think we want to move to best level right away," and offered to "show 78-24 and see what comes back." J.A. 1499. Chao testified at trial that the purpose of this false statement "was to give Mr. Abbas sort of an illusion, a false illusion that, you know, we were trying to buy the bonds cheaper for him." J.A. 592. Contrary to Chao's statement to Abbas, though, Gramins did not discuss the PPSI's price with Sunshine any further. After waiting a few minutes, Chao simply pretended that

16

Sunshine had lowered his bid again, telling Abbas, "ok, showing 79-24 offer now . . . there might be a little wiggle room here." J.A. 1499. This time, Abbas declined to raise his bid above 79-00. Gramins then bought the PPSI from Sunshine at 78-16 and Chao sold it to Abbas at 79-02. Nomura took an 18-tick commission on the trade.

Along with the details of these negotiations, the government also introduced evidence at trial concerning a then-recent prosecution for similar trading practices. In late January 2013, the government had indicted Jesse Litvak, a trader at the global securities broker-dealer Jefferies & Company ("Jefferies"), for making misrepresentations in the context of his business activities. *See United States v. Litvak*, 808 F.3d 160, 166 (2d Cir. 2015) ("*Litvak I*"). Jefferies was one of Nomura's competitors, and Litvak occupied a trading position similar to Gramins's. The Litvak indictment alleged that Litvak had "fraudulently misrepresented to purchasing counterparties the costs to Jefferies of acquiring

17

certain RMBS" and "fraudulently misrepresented to selling counterparties the price at which Jefferies had negotiated to resell certain RMBS." *Id.*[5]

Jonathan Raiff, Nomura's head of Global Markets for the Americas, testified at Gramins's trial concerning the firm's reaction to the Litvak indictment. Raiff testified that the Litvak indictment was "something everyone was aware of," J.A. 268, was "a subject of conversation" in the RMBS industry, and that "lots of people were discussing it," J.A. 299. Raiff also testified that in early February 2013, about a week after the Litvak indictment, Nomura scheduled a compliance training session for traders and salespeople in its securitized products groups. Gramins attended that training session. Raiff testified that the training session "was held specifically to discuss the conduct at issue in the Litvak indictment," J.A. 301, and that the "general focus of the session was if you say something, make sure it's accurate," J.A. 300. The training session also operated as a "refresher" on principles from Nomura's compliance manual, J.A. 319, including its prohibitions on making misrepresentations to clients. Testimony concerning the Litvak indictment and Nomura's reaction to it was offered by the government as proof

---

[5] The indictment formally charged Litvak with eleven counts of securities fraud pursuant to 15 U.S.C. §§ 78j(b), 78ff; one count of fraud against the United States pursuant to 18 U.S.C. § 1031; and four counts of making false statements pursuant to 18 U.S.C. § 1001. *Litvak I*, 808 F.3d at 166.

18

that the defendants understood the wrongfulness of their deceptive trading practices.

The government also introduced evidence of one final RMBS trade that took place after the Litvak indictment and the associated Nomura compliance training session. On November 22, 2013, Gramins facilitated an order trade of JPMAC 2006-WMC1 A4 ("JPMAC") bonds between Wollman and Harrison Choi of The TCW Group, Inc. Gramins first messaged Choi, who offered to sell the bonds at 80-00. Minutes later, Gramins lied to Wollman about Choi's offer, saying: "ok here's what i just got / 29+mm A4's @ 81-16." J.A. 1573. That caused Wollman to raise his bid to "80 flat." J.A. 1574. Minutes later, Gramins lied again, this time to Choi, and over the phone. Gramins told Choi: "[The buyer] wanted to be 78. I said no. I have 78 and three-quarters." J.A. 1582. That caused Choi to lower his offer to "79 and a quarter." J.A. 1584.

After speaking to Choi, Gramins called Michael Romanelli ("Romanelli"), a salesperson for Nomura. Gramins and Romanelli discussed how to phrase Choi's latest offer to Wollman and whether Romanelli (instead of Gramins) should convey it to Wollman over the phone. The two agreed on a phrasing of "80 and a half to you," and Romanelli told Gramins, "keep it in chat, because if I call, he's

19

gonna get suspicious and start asking me questions." J.A. 1586, 1587. Minutes later, Gramins told Wollman, over instant message, "i have beaten [Choi] up as much as i can / 80-16 is the best i can get them to you." J.A. 1575. Gramins confirmed to Wollman that this price factored in a commission from Choi, even though he and Choi had not discussed any. Wollman agreed to the price. Gramins then bought the JPMAC bond from Choi at 79-08 and sold it to Wollman at 80-16, taking a 40-tick commission on the trade.

**III.**

On September 3, 2015, the government indicted Gramins, along with his alleged co-conspirators Ross Shapiro and Tyler Peters (collectively with Gramins, the "defendants"). On March 6, 2017, the government filed the operative indictment. The indictment charged the defendants with two counts of securities fraud, pursuant to 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5; six counts of wire fraud, pursuant to 18 U.S.C. § 1343; and one count of conspiracy to commit securities fraud and wire fraud, pursuant to 18 U.S.C. § 371.

Much of the trial focused on whether the defendants' lies were "material" to their counterparties' investment decisions, as required under the securities and wire fraud statutes. *See, e.g.,* 15 U.S.C. § 78j(b). The government sought to prove

20

materiality in part with testimony from four of Nomura's counterparties: Zachary Harrison of Putnam Investments, Eric Marks of Ellington Capital Management, Abbas of HIMCO, and Wollman of QVT Financial. Before the jury, these counterparties described the BWICs and order trades outlined above, in which Gramins or one of his associates had lied to them, and explained how those lies had impacted their investment decisions.

One of these witnesses, Wollman of QVT Financial, gave the testimony that Gramins now contends was improperly admitted. In that testimony, Wollman alluded to the distinction between inventory trades and "riskless transactions," explaining that he maintained heightened expectations of truthfulness from his broker-dealer in the latter context. For example, early on in his direct examination, Wollman stated that he "recognize[d] the relationship between me and the broker-dealer can vary so . . . I'll take that into account in what I'm saying and how I'm processing what I'm being told." J.A. 681. He then elaborated on that statement, explaining that in the context of a BWIC auction, "there I'm literally just submitting a bid, and I expect the broker is just doing what I'm telling them

to do," while in the context of an inventory trade, "it's more me on one side and the dealer on the other side." J.A. 681.

Later on in his testimony, Wollman testified that he believed Gramins's representations during the AHMA trade because he understood that Gramins was "acting as a broker in this capacity." J.A. 688. In other words, in a "riskless" order or BWIC trade, Wollman explained, "he's not . . . buying bonds for his inventory," but rather "acting on behalf of another counterparty," or "facilitating a trade between me and that other counterparty." J.A. 688. Wollman emphasized that "in that context, I expect that facts that [Gramins] tells me are truthful." J.A. 688. Later, in another exchange, Wollman explained that Gramins was "brokering a trade between me and another counterparty" in the context of the JPMAC transaction. J.A. 705. In other words, he reiterated, the bonds at issue "aren't [Gramins's] bonds, he is—his role in this is to match together a seller of bonds and a buyer of bonds—two other counterparties, not him—and he's facilitating that transaction." J.A. 705.

Finally, on redirect examination, the government reviewed the three charged trades—AHMA, INDX, and JPMAC—in which Wollman had engaged with Gramins. The government attorney asked Wollman whether he thought he

was "sitting across the table from" Nomura in the context of each trade. J.A. 727. With respect to each trade, Wollman responded in the negative. In the AHMA trade, he testified, Nomura was "brokering a trade for me," or "acting as a broker, a facilitator." J.A. 727. Regarding the INDX BWIC, he testified that the transaction "was almost more clerical, administrative than . . . anything else." *Id*. Regarding the JPMAC trade, too, Wollman explained that the transaction "was a broker trade" with "a seller and a buyer." *Id*. Gramins claims that these portions of Wollman's testimony were irrelevant and unduly prejudicial under *Litvak II*.

The government's rebuttal summation produced two additional items to which Gramins objected. The first involved the government's reference to transactions not charged in the indictment. Prior to trial, the government had moved *in limine* to preclude evidence of "the supposed absence of criminal activity in [the defendants'] uncharged securities transactions." J.A. 73. The district court did not rule on this motion, but the parties informally agreed not to reference any specific uncharged trades at trial. In his closing argument, however, Shapiro's counsel argued that the trades charged in the indictment amounted to "substantially less than $5 million" over four years, which could not have

significantly affected the defendants' compensation, and that therefore the government had produced "zero evidence" of motive. J.A. 869–70. In response, on rebuttal summation, the government reminded the jury that "these are a selection of the trades," and that "we could be here for six months if we bring you every trade." J.A. 896; *see also id.* ("Dinucci told you that these tactics would occur almost daily; and Feely told you that the defendants would engage in these tactics at every opportunity, which he also estimated would be daily."). After summations, defense counsel asked the district court for a curative instruction limiting the jury to those trades specifically charged in the indictment, which the district court gave.

The second issue concerned the government's summary of the elements of securities and wire fraud through the rhetorical question, "Did the defendants lie to take money?" J.A. 895. The government explained that "[h]ow you answer this question will answer all the other problems that you have with deliberations," because if the defendants lied to take people's money, "that is intent, that is their intent to defraud people," and if the defendants repeatedly did so, that "shows they thought it would work, they thought it was material." J.A. 895. Defense counsel objected to that summary of the law. In response, the district court

augmented its previous instruction on the definition of willfulness, informing the jury that "the government must prove beyond a reasonable doubt that the defendant knew that his conduct was wrongful and involved a significant risk of violating the law." J.A. 912.

On June 15, 2017, the jury reached its verdict. The jury convicted Gramins on the conspiracy count, failed to reach a verdict with respect to Gramins on one count of securities fraud and one count of wire fraud, and acquitted Gramins on all remaining counts.[6] The district court declared a mistrial on the unresolved counts but otherwise accepted the jury's partial verdict.

**IV.**

On August 28, 2017, Gramins filed his post-trial motions. He moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("FRCRP") 29 on the conspiracy count of which the jury had convicted him, and on the two substantive counts on which the jury had deadlocked. He also moved, in the alternative, for a new trial pursuant to FRCRP 33 on his sole count of conviction. Finally, Gramins renewed his pre-trial motion to dismiss the indictment under the

---

[6] The jury acquitted Shapiro on all counts but the conspiracy charge, on which it failed to reach a verdict. The jury acquitted Peters on all counts.

Due Process Clause of the Fifth Amendment, arguing that he lacked fair notice at the time of the indictment that his trading tactics were illegal. The government opposed all of Gramins's motions and filed briefing to that effect on October 20, 2017.

On May 3, 2018, before the district court had ruled on Gramins's post-trial motions, the Second Circuit issued its opinion in *Litvak II*. The government's prosecution of Jesse Litvak had taken several twists and turns since his initial indictment in 2013. First, a jury in the United States District Court for the District of Connecticut had convicted Litvak on the ten counts of securities fraud with which he was originally charged,[7] but this Court vacated those convictions on evidentiary grounds in *Litvak I*. *Litvak I*, 808 F.3d at 169. At Litvak's second trial, the jury convicted him of a single count of securities fraud. *Litvak II*, 889 F.3d at 59. Litvak moved for a judgment of acquittal pursuant to FRCRP 29 or, alternatively, for a new trial pursuant to FRCRP 33. *Id.* at 64. The district court denied those motions, and Litvak again appealed its ruling to this Court. *Id.*

---

[7] The jury had also convicted Litvak on one count of fraud relating to the Troubled Asset Relief Program ("TARP") and four counts of making a false statement in a matter within the jurisdiction of the United States government. *Litvak I*, 808 F.3d at 169.

In *Litvak II*, this Court rejected Litvak's challenge to the denial of his motion for a judgment of acquittal, holding that the government's evidence was sufficient to support a conviction as a matter of law.   889 F.3d at 66–67.   But we vacated Litvak's conviction and remanded for a new trial anyway, again on evidentiary grounds.   *Id.* at 72.   *Litvak II* held that Litvak's conviction was tainted by testimony from Brian Norris, one of Litvak's counterparties, as to Norris's erroneous belief that Litvak had been acting as his agent in executing his trades. *Id.* at 67.   The opinion referenced the "reasonable investor" standard that governs proof of materiality for purposes of securities fraud and reasoned that "Norris's indisputably idiosyncratic and unreasonable viewpoint is not . . . probative of the views of a reasonable, objective investor in the RMBS market."   *Id.* at 69. Therefore, this Court held, Norris's testimony was irrelevant in violation of FRE 401 and likely to confuse or mislead the jury in violation of FRE 403, and the district court's admission of that testimony required a new trial.   *Id.*

Both Gramins and the government filed supplemental briefing with respect to Gramins's post-trial motions in light of our holding and analysis in *Litvak II*. On June 5, 2018, the district court ruled on Gramins's motions.   The court denied Gramins's motions for a judgment of acquittal, noting that counterparty witnesses

had testified at trial to the importance of Gramins's misrepresentations and that "a rational trier of fact could find that the 'point of view' of these witnesses was 'within the parameters of the thinking of reasonable investors' in the RMBS market at the time." Sp. App. 2 (quoting *Litvak II*, 889 F.3d at 65). But the district court granted Gramins's motion for a new trial. Although the court acknowledged that, unlike Norris's testimony at Litvak's trial, no witness had explicitly claimed that an agency relationship existed between Gramins and his counterparties, the court nevertheless concluded that "Wollman strongly implied that that is how he viewed the role of broker-dealers in the RMBS market when brokering trades." Sp. App. 14. Because Wollman's testimony had suggested to the jury that Gramins owed fiduciary duties of loyalty and honesty to his trading counterparties, the district court reasoned, a new trial was necessary.[8]

The district court also addressed the government's comments during rebuttal summation. The court agreed with defense counsel that the government's reference to uncharged transactions was inappropriate, but concluded that two curative instructions had adequately addressed it. As for the

---

[8] The district court also rejected Gramins's renewed motion to dismiss the indictment on due process grounds.

28

government's rhetorical device asking whether the defendants "l[ied] to take people's money," the district court concluded that "it does not appear that [this] oversimplification of the law was calculated to inflame the jury," nor "that the jury was [in fact] misled." Sp. App. 12. Accordingly, the district court concluded that neither statement alone rose to the level of prosecutorial misconduct or warranted a new trial. Nevertheless, in granting Gramins's motion for a new trial, the district court took those comments into account, reasoning that "[e]ven if the admission of Wollman's 'point of view' testimony, standing alone, does not justify vacating Gramins's conviction, the combination of errors described above justifies a new trial." Sp. App. 20.

The government timely appealed the district court's order granting Gramins a new trial. The Solicitor General authorized the appeal.

**DISCUSSION**

Our review of the district court's ruling granting Gramins a new trial implicates several interlocking legal standards. Most importantly, this Court reviews a district court's decision to grant a new trial pursuant to FRCRP 33 for "abuse of discretion." *United States v. Robinson*, 430 F.3d 537, 542 (2d Cir. 2005). In applying that standard, "we are mindful that a judge has not abused her

29

discretion simply because she has made a different decision than we would have made in the first instance." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). Nevertheless, we note that a district court has "abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), or rendered a decision that "cannot be located within the range of permissible decisions," *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

Furthermore, we also note that the district court exercised its discretion subject to the standards governing a FRCRP 33 motion for a new trial. FRCRP 33 states that "the court may . . . grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. While we have stated that FRCRP 33 gives the district court "broad discretion" to grant a new trial, *Ferguson*, 246 F.3d at 133, district courts must exercise that discretion "'sparingly' and in 'the most extraordinary circumstances,'" *id.* at 134 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)), and only in order to "avert a perceived miscarriage of justice," *id.* at 133 (quoting *Sanchez*, 969 F.2d at 1413). In short, the "ultimate test" for granting a new trial pursuant to FRCRP 33 is "whether letting a guilty verdict stand would be a *manifest injustice*." *Id.* at 134 (emphasis added).

30

Finally, while the district court granted Gramins a new trial on the basis of the Wollman testimony that it admitted during his original trial, this Court typically "review[s] a district court's evidentiary rulings under a deferential abuse of discretion standard, and . . . will disturb an evidentiary ruling only where the decision to admit or exclude evidence was 'manifestly erroneous.'" *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015) (quoting *United States v. Samet*, 466 F.3d 251, 254 (2d Cir. 2006)). Even if a decision was "manifestly erroneous," this Court will affirm "if the error was harmless." *Id.* (citing *United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010)). Therefore, while we review the district court's FRCRP 33 ruling for abuse of discretion, we note that the district court's discretion did not encompass legal error in its reading of *Litvak II* and was also determined by the "manifest injustice" standard required for granting a FRCRP 33 motion and the strong deference typically afforded to evidentiary rulings made at trial.

**I.**

A conviction for securities fraud pursuant to 15 U.S.C. § 78j(b) requires the government to prove that, "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent

device." *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (internal quotation marks and citations omitted).[9] This appeal, as with Litvak's, "focuses largely on the element of materiality." *Litvak II*, 889 F.3d at 64. A misstatement in a securities transaction is material if there is "a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." *Id.* (citing *Vilar*, 729 F.3d at 89). A misrepresentation is important to a reasonable investor, in turn, if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The government and defense counsel each advanced competing theories of materiality at trial. The government, for its part, argued that in a negotiation over the price of a security, information about the price at which other market participants are willing to trade that security is necessarily important to the

---

[9] Gramins's conviction for conspiracy to commit securities fraud implicated those same elements because it required the government to prove that Gramins agreed with one or more others to commit the unlawful act of securities fraud. *See, e.g., United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006).

reasonable investor. *See, e.g.*, J.A. 835 (arguing that materiality is "almost obvious" because Gramins's statements concealed the fact that the counterparty "could have bought" the security at a "cheaper [price] than what [he] eventually ended up paying"); J.A. 899 (calling it "common sense" that "in this brokered market where you're lining up people, what the broker-dealer says about what the guy over there is willing to pay is going to affect what you might be willing to sell at"). The government also pointed to the opaque nature of the RMBS market, which lacks an exchange, forcing counterparties to rely exclusively on their broker-dealers for information about price. *See, e.g.*, J.A. 830 ("When it came to perhaps the most critical piece of information in a negotiation . . . the only way the bidder knew what the seller was offering[] was if and when the broker-dealer Nomura, the defendants, chose to give that information."). Finally, the government relied on the "norms of the market," whereby, in the context of BWIC and order trades, "[b]uy side accounts buy and sell to each other through the broker-dealer." J.A. 898. In those trading contexts, the government argued, reasonable investors credited broker-dealers' representations based on "years of experience" with broker-dealers accurately relaying bids and offers. J.A. 838.

33

Defense counsel painted a different picture of the RMBS market, emphasizing the principal-to-principal nature of RMBS transactions as a formal legal matter. *See, e.g.*, J.A. 872 ("Nomura didn't have to sell anybody anything unless they got the price they wanted."). Because every participant in the RMBS market transacted solely as a principal, the defense argued, sophisticated counterparties simply would not have placed any significance on their broker-dealers' statements about price. *See, e.g.*, J.A. 873 ("[E]very ounce of proof in this case tells you that [the counterparties] were not attaching any significance to anybody's words or anybody's acquisition cost or anybody's profit, not in this market . . . ."). And Nomura's counterparties were indeed sophisticated; defense counsel emphasized the complex mathematical models and other objective sources that RMBS traders used to guide their investment decisions. *See, e.g.*, J.A. 874 ("[The counterparties] told you the model was the anchor; they told you the model was the foundation, it was the base of all decision-making."); J.A. 874 ("The model, the data, the price talk, the color, the independent pricing services, that's what goes into the final decisions, not Nomura's sales chat."). Finally, the defense noted that the counterparty witnesses unanimously testified at trial that

they continued to be "happy with the bond they bought or sold at the price they bought or sold it." J.A. 871.

"Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'" *Litvak I*, 808 F.3d at 175 (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)). Absent violation of the FRE, the government had the right to advance its theory of materiality that, based on relevant features of the market for RMBS, a reasonable investor would have relied on the sorts of misrepresentations that Gramins and his co-conspirators made in the context of certain trades. Likewise, the defense had the right to advance its theory of materiality that, in a market full of sophisticated investors relying largely on complex models, no reasonable investor would have credited broker-dealers' representations about RMBS prices. And the jury had the right to accept whichever theory of materiality it found more persuasive in light of the testimony and other evidence before it at trial. In short, the question of whether Gramins's misrepresentations were material under the reasonable investor standard was for the jury to decide in light of the opposing theories advanced by the two sides and the evidence that each side marshalled to support them.

35

The government sought to support its theory of materiality in part with direct testimony from several of Nomura's counterparties. The government called four of Nomura's counterparties to the stand, and all four testified that they considered the defendants' lies important to them in the context of the price negotiations in which they occurred. For example, the government elicited testimony from Marks concerning a negotiation in which Nomura had lied to Marks about the seller's offer price. The government informed Marks of the true offer price and asked him, "[W]ould the truth, would that information have been important information in the course of this negotiation?" J.A. 743. Marks responded, "Yes, it would be important. I would probably negotiate differently. . . . I would probably try to see if I could buy the bonds at a cheaper price." J.A. 743. Harrison answered a similar "importance" question similarly, telling the jury, "In this kind of negotiation with another end account where Nomura was the middleman, accurately relaying information back and forth would have been important, especially this kind of information regarding the price level." J.A. 351. Abbas likewise answered the "importance" question: "Yes. All of that is the color that I'm receiving regarding an ongoing negotiation, so from that angle it's important." J.A. 537. *See also* J.A. 688 (Wollman testifying similarly).

36

Both *Litvak I* and *Litvak II* establish that this sort of testimony from a broker-dealer's counterparties can constitute sufficient evidence of materiality to support a conviction for securities fraud. *See Litvak I*, 808 F.3d at 175–76 ("[T]estimony from several representatives of Litvak's counterparties that his misrepresentations were 'important' to them in the course of the transactions . . . and that they or their employers were injured by those misrepresentations . . . . precludes a finding that no reasonable mind could find Litvak's statements material." (citation omitted)); *Litvak II*, 889 F.3d at 66 (citing *Litvak I* and holding that "there was sufficient evidence for a rational jury to find [Litvak's] misstatements material beyond a reasonable doubt" on the basis of testimony from Litvak's counterparties). In other words, a rational jury could have found, on the basis of counterparty testimony that the defendants' misrepresentations were important to those counterparties' investment decisions, that those misrepresentations were material. The district court therefore properly applied our holdings in *Litvak I* and *II* in denying Gramins's motion for judgment of acquittal.

The question before us today is thus not whether the government introduced evidence sufficient to support the jury's conviction of Gramins on its theory of materiality, but whether the presentation of that evidence at trial gave

37

the government an unfair advantage in pressing that theory to the jury. We encountered different manifestations of that same general question in *Litvak I* and *Litvak II*. The *Litvak* precedents reflect our attempts to referee the debate between the government and defense counsel over these conflicting theories of materiality by policing the evidence presented at trial to support them.

In *Litvak I*, we considered testimony from a business school professor and expert witness for the defense that "where a manager follows rigorous valuation procedures, as was the case here, consideration of, or reliance on, statements by sell-side salesmen or traders concerning the value of a RMBS or the price at which the broker-dealer acquired it or could acquire it, are not relevant to that fund's determination with respect to how much to pay for a bond." *Litvak I*, 808 F.3d at 182. The district court had excluded that expert testimony on relevance grounds, but we disagreed. We described the testimony as "highly probative of materiality" and "undoubtedly relevant to the jury's determination" on that element. *Id.* at 182–183. "With such testimony before it, a jury could reasonably have found that misrepresentations by a dealer as to the price paid for certain RMBS would be immaterial to a counterparty that relies not on a 'market' price or the price at which prior trades took place, but instead on its own sophisticated

38

valuation methods and computer model." *Id.* at 183. In short, the district court's evidentiary ruling unfairly tipped the scales against the defense's theory of materiality. We consequently vacated that ruling and remanded for a new trial in which defense counsel could present its theory to the jury unimpeded, and with relevant expert testimony to support it.

In *Litvak II*, we encountered a different problem: misstatements of agency law by government witnesses that unduly *supported* the *government's* theory of materiality. At Litvak's second trial, one of the government's counterparty witnesses had erroneously testified that Litvak was acting as his "agent" (rather than as a principal) in facilitating RMBS transactions between him and other counterparties. In addressing this testimony, we reiterated the importance of point-of-view testimony from a defendant's counterparties, but held that in order to be relevant such testimony must fall "within the parameters of the thinking of reasonable investors in the particular market at issue." *Litvak II*, 889 F.3d at 65. We reasoned that a counterparty's erroneous claim of an agency relationship with the defendant could unduly prejudice the jury "because it might cause a jury to 'construe [Litvak's misstatements] as having great import to a reasonable investor if coming from the investor's *agent*.'" *Id.* at 68 (quoting *Litvak I*, 808 F.3d at 187

(emphasis and alterations in original)). In short, we again concluded that an evidentiary ruling at trial had unfairly tipped the scales in favor of the government, this time by the *admission* of evidence that unduly advanced the government's theory. We vacated and remanded for a new trial without the prejudicial testimony.

*Litvak II* was decided after the conclusion of Gramins's trial, and the district court issued its decision granting Gramins a new trial shortly after *Litvak II*. In its decision, the district court attempted to follow our lead from *Litvak I* and *Litvak II*, finding that evidentiary rulings at Gramins's trial had prejudiced the materiality debate in favor of the government. Here, however, we conclude for the reasons stated below that nothing that occurred at Gramins's trial conferred an undue advantage on the government in the battle over the issue of materiality. The debate over whether Gramins's misrepresentations were material should therefore have remained where it nearly always belongs: with the jury selected to determine Gramins's guilt or innocence.

## II.

The district court granted Gramins a new trial on the basis of this Court's evidentiary holdings in *Litvak II*. In that case, as described above, this Court

vacated Litvak's conviction for securities fraud on the basis of statements from one of Litvak's counterparties, Brian Norris, who "testified that he believed [Litvak] to be his agent, and that broker-dealers serve as an agent in between buyers and sellers." *Litvak II*, 889 F.3d at 63 (internal quotation marks and alterations omitted). As both parties acknowledged at Gramins's trial below, Norris's statements were in fact incorrect. Litvak, like Gramins and like any other broker-dealer in the RMBS market, transacted at all times as a principal, and never as an agent for any counterparty.

In *Litvak II*, we held that Norris's misstatements of agency law provided two grounds for vacatur of Litvak's conviction. First, we held that the district court should have excluded the evidence as irrelevant under FRE 401, which defines "relevant" evidence to include evidence having "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401. We began by noting that the materiality requirement for securities fraud is an objective one, requiring the government to show "that the disclosure of the omitted fact would have been viewed *by the reasonable investor* as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32 (emphasis added). We then reasoned that a counterparty witness's

"idiosyncratic and erroneous" belief, *Litvak II*, 889 F.3d at 59, "is not . . . probative of the views of a reasonable, objective investor in the RMBS market," *id.* at 69. Given that no agency relationship exists between a broker-dealer and its counterparties as a matter of law, *id.*, a counterparty witness's contrary testimony that such an agency relationship *did* in fact exist would be both erroneous and idiosyncratic, and therefore irrelevant to materiality under the objective, "reasonable investor" standard, *id*.

As an alternative ground for vacatur, we held that the district court should have excluded Norris's testimony under FRE 403 given its tendency to confuse or mislead the jury. *Id.* FRE 403 provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We reasoned that Norris's testimony "had a high probability of confusing the jury by asking it to consider as relevant the perception of a counterparty representative that was entirely wrong," and that it could potentially "mislead the jury based on the government's argument that a perceived relationship of trust showed materiality." *Litvak II*, 889 F.3d at 69. The district

court thus abused its discretion, we held, by failing to exclude the testimony on either of two potential evidentiary grounds. *Id.*

**A.**

Gramins sought a new trial, and the district court granted one, on the basis of Wollman's testimony against Gramins and its purported similarity to the Norris testimony at issue in *Litvak II*. Wollman's testimony against Gramins, however, is a horse of a different color. To begin with, Wollman's testimony, unlike Norris's, was neither "erroneous" nor "idiosyncratic." *Id.* at 59. First, the testimony was not "erroneous" because Wollman made no misstatements of agency law. Nowhere in the record of Gramins's trial does Wollman state that he believed that Gramins was his agent, nor that Gramins owed him fiduciary duties. In fact, nowhere in the record does Wollman advert to any principles of agency law at all.

The portions of Wollman's testimony on which Gramins relies do not erroneously claim an agency relationship with Gramins. For instance, Gramins's brief on appeal emphasizes Wollman's many references to Gramins's role as a "broker" or to his conduct as "brokering." *See, e.g.*, J.A. 688 (Wollman: Gramins was "acting as a broker in this capacity"); J.A. 705 (Wollman: Gramins was

43

"brokering a trade between me and another counterparty"). But even contemporaneous statements from Gramins and other *broker-dealer* representatives make clear that the word "broker" is a common shorthand for the role played by a broker-dealer in matching one counterparty with another, rather than a synonym for the legal role of "agent." See J.A. 1337 (Gramins to seller: "happy to reflect what you like . . . and I am purely looking to broker."); J.A. 221 (Dinucci: "Brokering trades is when you have a buyer and a seller matched up on a bond, and you simply play the middleman in that transaction.").

Other statements drawn from Wollman's testimony likewise do not contain erroneous statements of agency law. These comments merely describe the *business* context in which Wollman typically interacted with Gramins, which involved Gramins communicating price negotiations with another counterparty in an effort to "facilitate" a transaction between Wollman and that counterparty. For instance, Wollman's comment that Gramins was "acting on behalf of another counterparty," J.A. 688, merely conveyed that Gramins was communicating bids and offers from that counterparty, rather than negotiating about a bond that he (Gramins) already owned. Likewise, Wollman's comment that he was not "sitting across the table" from Gramins in the context of a "broker trade," J.A. 727,

44

served to contrast an order trade, in which Gramins proposed to deliver a bond to (or receive it from) a second counterparty other than Wollman, with an inventory trade, in which no counterparty other than Wollman existed.   Wollman explained throughout his testimony that he had different expectations of Gramins in the context of an order or BWIC trade, in which Gramins was (to use Gramins's own phrase) "merely looking to broker" a trade between two other counterparties, than he did in the context of an inventory trade, in which Gramins and Wollman transacted alone.

Indeed, every portion of Wollman's testimony to which Gramins refers in defending the district court's order similarly served to distinguish the former business context from the latter.   Statements like these do not misstate the law— nor do they correctly state the law.   They simply do not purport to reflect any legal conclusion at all, instead merely describing (often in industry jargon) Wollman's different expectations across the two distinctive business contexts. Most importantly, statements like these vividly contrast with Norris's testimony in *Litvak II*, which explicitly asserted an incorrect belief about agency law that this Court recognized to be "entirely wrong."   *Litvak II*, 889 F.3d at 69.

Wollman's trial testimony was also not "idiosyncratic." Quite the contrary: all three of the government's other counterparty witnesses testified similarly as to their expectations of broker-dealer employees purporting to act in a "broker" capacity. Marks testified, regarding order trades, that he "would consider that to be a riskless transaction for the broker," J.A. 738, and would expect that the broker-dealer "would line up both sides of the trade and . . . execute each side individually but basically as close to simultaneously as they could," J.A. 744. Abbas testified that in the context of any non-inventory transaction, such as an order trade, he would expect a broker-dealer to accurately relay his bid to the seller and would rely on the broker-dealer's representations about the seller's offers as "color . . . regarding an ongoing negotiation." J.A. 537. Harrison explained, regarding order trades, that "[i]n this kind of negotiation with another end account where Nomura was the middleman, accurately relaying information back and forth would have been important, especially this kind of information regarding price level." J.A. 351. In light of this corroborating testimony from other counterparties, Wollman's description of his expectations when Gramins acted in a "broker" capacity were hardly atypical.

Relevance under the FRE is a low threshold, easily satisfied. "Evidence is relevant if: (a) it has *any tendency* to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010); *see also United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2014) ("[T]he definition of relevance under [FRE] 401 is very broad."); *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (explaining that FRE 401 prescribes a "very low standard" (internal quotation marks omitted)). "[U]nless an exception applies, all 'relevant evidence is admissible.'" *White*, 692 F.3d at 246 (alteration omitted) (quoting Fed. R. Evid. 402).

Views that are not "erroneous or idiosyncratic" do not implicate *Litvak II*'s core theory that "the point of view of an investor who is admitted to be wrong" could not be "relevant to prove what a reasonable investor, neither confused nor incorrect, would have deemed important." 889 F.3d at 69 (internal quotation marks and citation omitted). And Wollman's testimony, for the reasons outlined above, was neither "erroneous" nor "idiosyncratic." *Id.* at 59. Wollman's

47

testimony therefore did not fall within the specific category of irrelevant testimony proscribed by *Litvak II*, and the district court erred in concluding otherwise. Instead, applying the standards for relevance described above, Wollman's testimony—that he credited Gramins's representations when Gramins acted in a "broker" capacity, facilitating order and BWIC trades—had some "tendency" to make it "more probable" that a reasonable RMBS investor would have found Gramins's lies significant in the course of his or her deliberations. The testimony was thus relevant to the jury's assessment of materiality under FRE 401.

**B.**

Nor did Wollman's testimony advance the government's theory of materiality in an impermissible manner. As noted above, FRE 403 provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Considered within the overall context of this trial, Wollman's statements—none of which claimed that Gramins had acted as his agent or that Gramins owed him fiduciary duties—could not plausibly have prejudiced, misled, or confused the jury.

To begin with, Wollman himself, when questioned on cross-examination about the RMBS trades he engaged in, unequivocally expressed an accurate understanding about the formal legal nature of those transactions. He acknowledged that in the trades he had described on direct examination, "there's two parts of th[e] transaction." J.A. 714. Wollman agreed with defense counsel that "Nomura first has to buy the bond from the selling counterparty" and that Nomura "uses its own capital to do that." J.A. 714. He also agreed that "once [Nomura] owns [the bond], it has it—owns it in its inventory for even a little bit of time or a long time and then it gets entered into a separate transaction where it sells the bond [to the purchasing counterparty]." *Id*. Wollman also repeatedly agreed with defense counsel's description that in both BWIC and order trades, "there's two separate transactions," one in which "Nomura buys the bond from the seller, owns it, uses its capital," and a second in which Nomura "then sells it to its customer . . . in a separate transaction." *Id*. In light of this cross-examination exchange, in which defense counsel painstakingly clarified the legal structure of Wollman's RMBS transactions with Wollman's unhesitating agreement, it is difficult to see how Wollman's testimony on direct examination—none of which claimed an agency relationship with Gramins or, indeed, even

49

alluded to any propositions of agency law in the first place—could have misled or confused the jury as to the agency issue.

Furthermore, every legal authority present in the courtroom—prosecutors, defense counsel, and judge—expressly and repeatedly informed the jury that no agency relationship existed between Wollman and Gramins. The government specifically disclaimed the existence of an agency relationship on summation, informing the jury, "Nobody's claiming here that anybody is a fiduciary. The only person who has mentioned the word 'fiduciary' in this trial is the defendants. We're not claiming that." J.A. 836. On rebuttal summation, the government explicitly premised its argument on the absence of an agency relationship, arguing to the jury, "Just because you're *not* someone's agent, doesn't mean you get to rip them off." J.A. 898 (emphasis added). Defense counsel also repeatedly hammered on the absence of a fiduciary relationship between the defendants and their counterparties, in multiple instances that the jury could not plausibly have overlooked or even disbelieved. *See, e.g.*, J.A. 847 ("Every single trade that is charged in this case involved an arm's length principal-to-principal transaction."); J.A. 848 ("Nomura never acted as an agent or an adviser and they never had a fiduciary duty."); J.A. 861 ("So here the Court instructed you that, as a principal,

50

the defendants owed no duty of loyalty to the counterparties and were acting in their own self-interest, not the interest of the counterparties."); J.A. 874 ("We know this is a principal-to-principal market, you've heard it several times, everybody for themselves."). In short, the principal-to-principal nature of the RMBS market—as opposed to one involving an agency relationship—was an explicit, frequently reiterated premise of Gramins's entire trial.[10]

And nowhere was that clearer than in the district court's own instructions to the jury. Indeed, the court explicitly instructed the jury, on multiple occasions, that Gramins and his co-defendants were not agents or fiduciaries for any of their counterparties in any of the RMBS trades at issue. At the start, during the government's case, the court gave the jury a lengthy explanation of the term "fiduciary" and the legal concept of fiduciary duties. The court then instructed

---

[10] In granting Gramins's motion for a new trial, the district court expressed concern that "the Government relied on the mistaken notion that trading RMBS for one's own account and 'brokering' a transaction are fundamentally different types of transactions." S.A. 18 & n.5. But context makes clear that the government's statements did nothing to contradict its repeated acknowledgment—and the court's clear instruction—that the RMBS trades at issue occurred in a principal-to-principal market. Rather, as the district court recognized, the government merely used Wollman's testimony to contrast a situation in which "Nomura bought the bond and they're just hanging out with the bond and then they decide to sell the bond to someone else" and an order trade in which a broker negotiates simultaneously with both buyer and seller. *See id.* at 18 n.5.

the jury that "[t]he government does not claim that the relationship between Nomura and the counterparties involved in this case . . . was a fiduciary relationship, nor does the government claim that the individual defendants were in a fiduciary relationship with the counterparties." J.A. 326. The district court then further explained that "both sides agree that Nomura and the counterparties acted as principals, meaning that in each instance each one acted in its own interest." J.A. 326.

The court's final instruction to the jury, immediately preceding its deliberations, explicitly reiterated that the defendants were not agents of their counterparties. The district court explained the difference between an agent and a principal and then stated, "I instruct you that, as a matter of law, the defendants were at all times acting as principals on behalf of Nomura and not as the agent of the counterparties." J.A. 828. The court further explained that "when a defendant bought an RMBS bond from a counterparty, he was not the agent of that seller; and when a defendant sold an RMBS bond to a counterparty, he was not the agent of that buyer." J.A. 828. Finally, the court explained, "[a]s a principal, the defendants owed no duty of loyalty to the counterparties and were acting in their

own self-interest, not the interest of the counterparty." *Id.*[11]   The district court therefore repeatedly and correctly emphasized to the jury Gramins's formal status under the law.

We reject as implausible the notion that the jury may have discarded these straightforward and comprehensive jury instructions, along with supporting statements of the law from attorneys on both sides, in favor of the contrary and erroneous legal conclusion that Gramins acted as an agent for his counterparties or owed them fiduciary duties arising from his RMBS transactions.   *See United States v. Snype*, 441 F.3d 119, 129–30 (2d Cir. 2006) (recognizing a "strong presumption" that jurors follow the instructions they are given).   It seems particularly farfetched that the jury would override jury instructions and corroborating statements of the law from attorneys based on testimony from a non-lawyer like Wollman—testimony that did not even use the words "agent," "principal," or "fiduciary," much less use them to state any conflicting legal

---

[11] This final sentence also distinguished the district court's jury instructions here from the sole, cursory instruction given in *Litvak II*, where the court merely explained the difference between agent and principal and advised the jury that "Mr. Litvak was not the agent of the buyers or sellers of the RMBS," J.A. 1248, with no additional clarification that Litvak's status as a principal entailed an absence of fiduciary duties arising from his transactions with counterparties.

proposition. In short, given the overall context of Gramins's trial, we conclude that Wollman's testimony did not unduly prejudice, mislead, or confuse the jury under FRE 403.

## C.

The district court reached a contrary conclusion for two reasons that we will specifically address here. First, the district court concluded that Wollman's testimony "strongly implied" the existence of an agency relationship between himself and Gramins. S.A. 14. But as described above, the excerpts from Wollman's testimony highlighted by the district court merely served to distinguish between two categories of RMBS trades—one in which the broker-dealer purported to match a buying counterparty with a selling counterparty (order or BWIC trades) and another in which the broker-dealer purported to deal directly with a single counterparty (inventory trades). The government had the right to introduce testimony that RMBS counterparties treat a broker-dealer's representations differently in these two contexts.[12] While such testimony does

---

[12] Reasonable RMBS investors might do so for several reasons. For one thing, counterparties pay broker-dealers a commission in order and BWIC trades, but not in inventory trades, reflecting a commonly-held understanding that broker-dealers acting in the former capacity perform a "matching" service for which they are specifically compensated. For another, market participants commonly refer to order and BWIC trades as "riskless transactions," reflecting an understanding that while broker-dealers

not address the fact that the same *legal* relationship between broker-dealer and counterparty obtains across these various trade contexts, the defense was free to (and did) emphasize that fact on cross-examination and on summation. The relative significance of these facts about the RMBS market to the "reasonable investor" standard by which materiality is determined was for the jury to decide.[13]

Second, in explaining its expansive construction of *Litvak II*, the district court relied on our statement in that opinion that "[t]he government's concept of subjective trust as evidence of materiality became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries." *Litvak II*, 889 F.3d at 69–70. But read in context, that statement referred to the government's attempt at Litvak's trial "to cabin the effect of Norris's testimony"

---

acting in this capacity retain some risk as a technical legal matter, they have eliminated substantially all risk as a practical matter by arranging to transfer the bond from the selling counterparty to the buying counterparty by conducting two transactions in quick succession. *See supra*, pp. 6–8.

[13] We decline to decide whether any testimony that does not explicitly state a belief that broker-dealers in the RMBS market are the agents of their counterparties could offend Litvak II under some circumstances. But to the extent that counterparty testimony could ever offend *Litvak II*'s prohibition by implication—rather than by directly misstating the law—the implication must be substantially stronger than any present on this record. Otherwise, as this case demonstrates, an excessive vigilance for any suggestion of a legal misperception in a layperson's testimony could bar the government from introducing relevant and non-prejudicial testimony necessary to advance a theory of materiality that the law permits.

by arguing instead that "[Litvak] created the perception of acting as an agent and that he aimed to establish a relationship of trust." *Id.* (internal quotation marks omitted). In short, we concluded that the government's "relationship of trust" argument on summation became a device by which it magnified and emphasized Norris's "agency" testimony to the jury—allowing Norris's erroneous views entry through the "back door" into the jury's deliberations. Wollman's comparatively innocuous testimony does not raise these "back door" concerns with respect to Gramins's trial because it contained no erroneous statement to taint the jury's deliberations in the first place.

In light of the foregoing analysis, we conclude that the district court's decision to grant Gramins a new trial was based on an overbroad reading of *Litvak II* and therefore "cannot be located within the range of permissible decisions." *Zervos*, 252 F.3d at 169. We sympathize with the district court; this novel form of prosecution has raised issues of first impression and our two prior precedents on the subject are at times obscure.[14] Nevertheless, we conclude that admission of

---

[14] We are particularly sympathetic to the district court's concerns stemming from its having modeled an evidentiary ruling on the one at issue in *Litvak II*. Before trial, the district court denied defendants' motion to exclude evidence that, *inter alia*, defendants' victims perceived defendants to be their agents—thereby permitting the government to elicit testimony that victims "were misled to believe that the defendants' interests were aligned with their own and that the defendants were truthfully telling them what was

the Wollman testimony to which Gramins objects did not violate FRE 401 or 403, much less result in a "manifest injustice" at Gramins's trial, *Ferguson*, 246 F.3d at 134. The district court erred in concluding to the contrary.

### III.

The above analysis shows why the district court's admission of Wollman's testimony at Gramins's trial did not violate the FRE or otherwise constitute error. But even if admission of that testimony *did* constitute error, we conclude that any such error was harmless. "Even if a [district court's] decision was 'manifestly erroneous,'" and thus surpasses the threshold required to grant a motion for a new trial, this Court will nonetheless affirm the district court's decision to admit the

---

going on and that they relied on that in consummating the transaction." J.A. 139. The court later clarified that if a witness "wants to say that he thought that the defendant was acting as his agent, he could be cross-examined on that." J.A. 158. In granting Gramins's motion for a new trial, the district court explained that this evidentiary decision "followed the ruling in the Litvak case that formed the basis for the Second Circuit's recent vacatur" in *Litvak II*. S.A. 15. The district court was understandably concerned that it may have erred in permitting the introduction of certain point-of-view evidence pursuant to a ruling modeled after the one that necessitated the vacatur of Litvak's conviction. But even if it was error for the district court to *permit* the government to seek testimony that witnesses believed Gramins to be their agent, neither Wollman nor any of the other witnesses *actually* testified to that effect. Unlike the testimony that concerned us in *Litvak II*, Wollman's testimony was within "mainstream thinking of investors in that market," *Litvak II*, 889 F.3d at 65, and did not suggest that reasonable investors in the RMBS market might have considered Gramins their agent.

57

evidence "if the error was harmless." *Litvak II*, 889 F.3d at 67 (internal quotation marks omitted). In assessing harmlessness, we consider four factors: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *McGinn*, 787 F.3d at 127–28 (quoting *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010)).

We agree with Gramins regarding the first factor: the "overall strength of the prosecutor's case." *Id.* "Materiality was an issue central to [Gramins's] case and was hotly contested at trial." *Litvak I*, 808 F.3d at 184. As we explained in Part I, *supra*, the materiality question here is inherently difficult, both sides presented complex and opposing theories of materiality to the jury, and the jury ultimately decided that question on the basis of several days' testimony from which competing inferences could have been drawn. Accordingly, the first *McGinn* factor is at best a wash for the government. Nevertheless, we deem any error harmless on the basis of the other three factors.

With respect to the second factor, "the prosecutor's conduct with respect to the improperly admitted [testimony]" was not inappropriate or otherwise unfair

to Gramins. *McGinn*, 787 F.3d at 127. Quite the contrary. As explained above, the prosecutors actively took steps to disabuse the jury of any mistaken notion that Gramins acted in a fiduciary capacity. *See, e.g.*, J.A. 836 (government summation) ("Nobody's claiming here than anybody is a fiduciary. The only person who has mentioned the word 'fiduciary' in this trial is the defendants. We're not claiming that."). Even when the defendants *themselves* used terms like "agent" or "broker" in describing their role, the prosecutors explicitly disclaimed any associated legal conclusions when referencing that testimony. *See, e.g.*, J.A. 839 ("[Peters] [t]alks about trading both in agented roles, *his word and not mine*, and by taking position risk. Two different roles they played in the market." (emphasis added)). The prosecutors placed no undue reliance on Wollman's supposedly erroneous testimony, nor did they actively seek to imbue the jury with the mistaken impression of the law that that testimony supposedly conveyed.

As to the third factor—the testimony's "importance," *McGinn*, 787 F.3d at 127—the record does not support the conclusion that Wollman's testimony supplied the crucial difference resulting in the jury's sole conviction of Gramins. Because Wollman's testimony concerned only trades with Gramins (and not with any of his co-defendants), and because only Gramins was ultimately convicted of

59

any charges, Gramins urges us to draw the inference that Wollman's supposedly erroneous testimony differentiated Gramins from the other defendants in the jury's eyes. We question the basis for that inference. Because materiality is evaluated by an objective, "reasonable investor" standard, any testimony relevant to this standard would necessarily affect the case against all three defendants.

Moreover, a much more obvious inference exists to explain the different results. Materiality was not the only significant issue at Gramins's trial; the parties also hotly contested *intent*. *See, e.g.*, J.A. 829 (government summation) ("So [this] again takes you back to those two questions: Materiality and intent."). And on *that* issue, Gramins was *clearly* not similarly situated to his co-defendants. That is because only one of the trades referenced at trial—the JPMAC trade— occurred after the Litvak indictment, and that trade involved only Gramins. The fact that the JPMAC trade postdated the Litvak indictment provided strong evidence for Gramins's consciousness of wrongdoing. *See, e.g.*, J.A. 268 (Litvak indictment was "something everyone was aware of" in the RMBS industry); J.A. 301 (describing a compliance training session, which Gramins attended, "held specifically to discuss the conduct at issue in the Litvak indictment"). No similarly strong *mens rea* evidence was present for the other defendants, and the

60

jury could easily have rested its conviction of Gramins (but not the others) on that basis.

We note, additionally, that this understanding of the verdict finds strong support in the parties' closing arguments. Shapiro's counsel, for instance, repeatedly emphasized that *Shapiro* had *not* engaged in any deceptive trading practices subsequent to the Litvak indictment and associated compliance session. *See, e.g.*, J.A. 868 ("[I]n 2013, there was a compliance session. . . . There's not a shred, not a shred, of evidence that [Shapiro] ever used these tactics, ever, after that session, or at all in 2013, even before the session."); J.A. 870 ("The only evidence [on intent] is, as soon as [Shapiro] was told you can't engage in certain tactics, the desk stopped doing it, he directed people to stop doing it."). Not only that, but Shapiro's counsel even specifically emphasized that Shapiro had not participated in the JPMAC trade, effectively pointing the finger toward Gramins by the contrast. *See* J.A. 869 ("And what about that November 2013 trade? Well, [Shapiro] wasn't even involved in that trade."). Even Gramins's own counsel could not help but repeatedly emphasize the Litvak indictment as the temporal dividing line between culpable and non-culpable conduct. *See, e.g.*, J.A. 880 ("The bottom line is, *until Litvak*, nobody realized that what they were doing could be

61

construed as wrong or criminal." (emphasis added)); J.A. 880 ("But *until Litvak*, they never told anybody, you can say this in a chat but you can't say that." (emphasis added)).   This repeated emphasis on a category of evidence unique to Gramins further supports the inference that *mens rea* (and not materiality) likely made the difference in his conviction.

Finally, with respect to the fourth *McGinn* factor, we conclude that Wollman's testimony was indeed "cumulative of other properly admitted [testimony]."   *McGinn*, 787 F.3d at 127.   Every counterparty witness testified to the differences between order (or BWIC) and inventory trades, and all of those counterparty witnesses corroborated Wollman's testimony that a reasonable investor would have different expectations for his broker-dealer in those two contexts.   *See, e.g.*, J.A. 744 (Marks); J.A. 537 (Abbas); J.A. 351 (Harrison).   The fact that Wollman may have placed additional emphasis on this distinction, or discussed it at greater length, makes no difference.   In light of the above analysis, and our conclusions on three of the four *McGinn* factors, we conclude that any error in the admission of Wollman's testimony was indeed harmless.

**IV.**

Gramins also moved for a new trial on the basis of two statements from the government's rebuttal summation: one referencing RMBS trades not in evidence and another instructing the jury that "lying to take people's money" would constitute fraud. We agree with the district court that neither of these statements alone requires a new trial. *See* S.A. 11 (reference to uncharged trades "drew an immediate objection, which was addressed through two curative instructions"); S.A. 12 (finding that "it does not appear that [the prosecutor's] oversimplification of the law was calculated to inflame the jury," nor that "the jury was misled").

The district court, however, also concluded its opinion with a cursory analysis, contained under the heading "Cumulative Prejudice," stating as follows: "Even if the admission of Wollman's 'point of view' testimony, standing alone, does not justify vacating Gramins's conviction, the combination of errors described above justifies a new trial." S.A. 20. Because we conclude that the admission of Wollman's testimony did not constitute error at all, we necessarily conclude that this case does not present the same "combination of errors" that the district court believed amounted to "cumulative prejudice." Furthermore, we decline to recognize "manifest injustice" on the basis of two stray comments from

63

the government's rebuttal summation, both of which were squarely addressed by the district court's instructions to the jury and neither of which would independently require a new trial. *See, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999) (finding that "the accumulation of non-errors does not warrant a new trial"). Accordingly, we conclude that the district court's "cumulative prejudice" analysis does not provide a valid alternative ground for affirmance.

**CONCLUSION**

For the foregoing reasons, we REVERSE the district court's order and REMAND with instructions to reinstate the conviction.